```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/8/2017_
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

G.C.W., an infant by his mother and natural
guardian, MICHELLE RIVERA,

                              Plaintiffs,

        – against –

UNITED STATES OF AMERICA,

                              Defendant.

**MEMORANDUM OPINION AND ORDER**

1:15-cv-00294 (KHP)

**KATHARINE H. PARKER, United States Magistrate Judge**

        Plaintiff G.C.W. ("Plaintiff"), an infant by his mother and natural guardian, Michelle

Rivera, commenced this medical malpractice action against Defendant United States of America

under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).  Plaintiff alleges that Urban

Health Plans, Inc. ("UHP"), a federally scoped health clinic, was negligent in its provision of

prenatal care to Ms. Rivera, which resulted in injuries to the then-unborn Plaintiff.  Plaintiff now

moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56").

For the reasons that follow, Plaintiff's motion is **DENIED**.[1]

---

[1] On or about April 22, 2015, the parties consented to proceed before a U.S. Magistrate Judge for all proceedings in
the case.  (Doc. No. 8.)  The case was initially assigned to Magistrate Judge Debra Freeman, and was reassigned to
the undersigned on November 10, 2016.

**BACKGROUND**

I.     *Ms. Rivera's Hyperglycemia*

Beginning on August 30, 2013, Plaintiff's mother, Ms. Rivera, received prenatal care from UHP, which is located in the Bronx, New York.  On January 10, 2014, a UHP physician ordered a one-hour glucose challenge test for Ms. Rivera.  This test resulted in a laboratory finding that Ms. Rivera's glucose levels were higher than UHP's normal reference range.  UHP did not advise Ms. Rivera of her high glucose reading until February 7, 2014.

On February 7, 2014, Ms. Rivera returned to UHP and was ordered to undergo a follow-up three-hour glucose test.  The three-hour glucose test was performed on February 10, 2014.  The test revealed that Ms. Rivera's glucose levels exceeded the normal range (*i.e.,* that she was hyperglycemic) and that she suffered from gestational diabetes.  It is undisputed that, given Ms. Rivera's test results, her pregnancy would be classified as high-risk.  Under such circumstances, UHP's policy was to transfer a mother with gestational diabetes to a hospital for further treatment.  However, this did not occur in this case.[2]

On February 12, 2014 at approximately 7:00 p.m., Ms. Rivera went to Montefiore Hospital ("Montefiore") on her own accord because she was complaining of no fetal movement for that day, decreased fetal movement for the prior three days, nausea, vomiting, increased thirst, and urination.[3]  She was approximately 31 weeks pregnant with Plaintiff at this time.  At 7:50 p.m., Montefiore admitted Ms. Rivera and diagnosed her with hyperglycemia.  Shortly

---

[2] The parties dispute whether Ms. Rivera was notified of the results of her three-hour glucose test.  This dispute is immaterial for purposes of Plaintiff's motion for partial summary judgment, however, because the parties have stipulated that UHP deviated from the appropriate standards in its care of Ms. Rivera.  (Doc. No. 70.)

[3] The parties stipulated that Defendant's care of Ms. Rivera ceased upon her admission to Montefiore.  (Doc. No. 70.)

thereafter, Montefiore began treating Ms. Rivera with insulin and her glucose levels began to gradually lower.

II.   *Plaintiff's Injuries*

On February 13, 2014, while Ms. Rivera's glucose levels were trending downward towards the normal range, Plaintiff was recorded as having an intrauterine biophysical profile ("BPP") score of 8/8 at or around 1:35 a.m.[4]  A BPP score is "a measure of intrauterine fetal health that incorporates assessments of fetal movement, fetal tone, fetal breathing movements, amniotic fluid volume, and fetal heart rate." (Declaration of Jeffrey P. Phelan ("Phelan Decl.") (Doc. No. 68) ¶ 10.)  According to Defendant's expert, Dr. Jeffrey Phelan, a BPP score of 8/8 is normal and indicates a healthy fetus.[5]

At approximately 9:30 a.m. on February 13, 2014, Plaintiff was recorded as having a BPP score of 6/8.  Later that day, at around 8:39 p.m., Plaintiff was recorded as having a BPP score of 2/10.

At approximately 10:45 p.m. on February 13, 2014, Montefiore records reflect that its personnel spoke to Ms. Rivera about concerns regarding Plaintiff's neurological status. Montefiore's records state that it was anticipated that the "issue of whether a delivery would help or whether in utero recovery is expected" would come to the forefront the next day. (Montefiore 0606.)[6]  At 3:53 a.m. on February 14, 2014, Montefiore records reflect that Ms.

---

[4] Plaintiff had previously recorded a BPP score of 2/10 on February 12, 2014.

[5] In Plaintiff's Response to Defendant's Statement of Additional Material Facts and in his reply brief, Plaintiff disputes that a BPP score of 8/8 indicates a healthy and normal fetus, but he does not cite any medical authority to support his proposition.

[6] The records also reflect that Montefiore counseled Ms. Rivera about how "sometimes with such elevated glucose, pregnancy suffers [intrauterine fetal demise] from hyperglycemia." (*Id.*)  The Court notes that

Rivera stated she did not want intrauterine fetal demise and that she "wants the baby out." (Montefiore 0607.)   Montefiore subsequently performed a cesarean section on Ms. Rivera and delivered Plaintiff at 4:12 a.m.  Plaintiff, who weighed 3 pounds, nine ounces, required resuscitation and intubation after birth.  Plaintiff was admitted to Montefiore's Neonatal Intensive Care Unit.  Neurological evaluations conducted after birth indicated that Plaintiff's brain was severely damaged.  Plaintiff was subsequently diagnosed with spastic quadriparesis, severe cognitive impairment, cortical blindness, seizures, and spasms.

Plaintiff and Defendant proffer different versions of the facts leading up to Plaintiff's birth.

A.      _Plaintiff's Expert's Position_

In the view of Plaintiff's expert, Dr. Kaleb Yohay, Ms. Rivera's hyperglycemia contributed to Plaintiff's brain injury.  Dr. Yohay sets forth three interrelated theories of causation: (1) Ms. Rivera's hyperglycemia caused cell death in Plaintiff's brain; (2) Ms. Rivera's hyperglycemia damaged Plaintiff's brain, which exacerbated any subsequent brain traumas; and (3) the hyperglycemia led to Plaintiff's premature birth.  As to the first two theories, Dr. Yohay testified at his deposition that:

> the hyperglycemia that [Plaintiff] was exposed to essentially predisposes the brain towards cell death by build up of lactate and hypervolemia . . .  that by itself could lead to cell death, necrosis . . . .  There may have also been acute injuries superimposed on top of that.  But it's not really possible to separate out one from the other.  And the acute injury was in my opinion exacerbated -- if there was an acute injury it was exacerbated or essentially caused by this chronic issue of hyperglycemia.

---

Montefiore's concerns about the risks associated with Ms. Rivera's hyperglycemia, which were rendered concurrent with treatment, are consistent with the opinion proffered by Plaintiff's expert.

(Deposition of Kaleb Yohay, M.D. ("Yohay Dep. Tr.") 57:3-16; *see also* Yohay Dep. Tr.

47:14-17.)

As to the third theory, Dr. Yohay further explained:

[t]he hyperglycemia led to a variety of physiologic changes within the baby and baby's brain that led the baby to be in distress which led to the premature birth, and which contributed to the asphyxia and the inability to let the brain [] respond appropriately to periods of anoxia. So they're all sort of interrelated and intertwined and all resulted in a brain injury.

(Yohay Dep. Tr. 88:7-16.)

B.    *Defendant's Experts' Positions*

To rebut Dr. Yohay's findings, Defendant retained two expert witnesses, Dr. Phelan and

Dr. Walter Molofsky. Dr. Phelan and Dr. Molofsky each prepared a report summarizing their

respective opinions, was deposed by Plaintiff's counsel, and submitted a Declaration in

opposition to Plaintiff's motion for summary judgment. The crux of Dr. Phelan's and Dr.

Molofsky's opinions is that Ms. Rivera's hyperglycemia did not cause or contribute to Plaintiff's

injuries.

1.  **Dr. Phelan**

In the Declaration of Jeffrey Phelan (the "Phelan Declaration") submitted in opposition

to Plaintiff's motion for summary judgment, Dr. Phelan opines that, while under the care of

Montefiore, Plaintiff fully recovered from the effects of his mother's earlier untreated

hyperglycemia, and then an independent event caused Plaintiff's injuries shortly before his

birth. Specifically, Dr. Phelan asserts:

- Plaintiff had fully recovered from his mother's earlier untreated hyperglycemia and was neurologically normal at the time he recorded the BPP score of 8/8 in the early morning of February 13, 2014.

- Since Plaintiff fully recovered at Montefiore, "any deviation from the standard of care by healthcare providers at [UHP] had no impact on the injuries subsequently sustained by [Plaintiff.]"  (Phelan Decl. ¶ 12.)

- Plaintiff's condition "most likely resulted from a hypoxic event that commenced no earlier than 3:32 a.m. on February 14, 2014, and . . . not the earlier maternal hyperglycemia."  (Phelan Decl. ¶ 17.)

- Based upon a review of the medical records and Plaintiff's cord gas levels, Plaintiff's "asphyxia began between 3:32 a.m. and 3:48 a.m. on February 14, 2014; and his brain damage arose subsequent to 3:32 a.m. and prior to his birth at 4:12 a.m."  (Phelan Decl. ¶ 13.)

- The Neonatal Encephalopathy Committee of the American College of Obstetricians and Gynecologists and the American Academy of Pediatrics ("ACOG/AAP") has published guidelines for defining intrapartum asphyxia sufficient to produce cerebral palsy.  Based upon these guidelines and a review of Plaintiff's medical records, Plaintiff's "birth and neonatal course satisfied the ACOG/AAP criteria for his brain injury to have arisen intrapartum or at the time immediately prior to his birth."  (Phelan Decl. ¶¶ 14-16.)

In his expert report dated March 28, 2016, Dr. Phelan further opined, *inter alia*, that UHP did not contribute to or cause Plaintiff's injuries because Plaintiff's "brain damage and

organ impairment arose at Montefiore Medical Center at, or around the time of his birth, and/or was contributed to by his prematurity and/or his multiple dysmorphologic features." (Doc. No. 68-2, p. 8.)

### 2. Dr. Molofsky

In the Declaration of Walter Molofsky (the "Molofsky Declaration") submitted in opposition to Plaintiff's motion for summary judgment, Dr. Molofsky opines that the degree and extensiveness of Plaintiff's injuries are inconsistent with injuries that may be caused by maternal glucose levels.  Dr. Molofsky concludes that "even if [Ms.] Rivera's prenatal glucose levels had been normal, [Plaintiff] would still have been as neurologically impaired as I found him during my examination."[7]  (Declaration of Walter J. Molofsky ("Molofsky Decl.") (Doc. No. 69) ¶ 7.)

In his expert report dated March 18, 2016, Dr. Molofsky stated the following findings: "while [Plaintiff's] neurological status may have been influenced by his maternal hyperglycemia[,]. . . given his overwhelming neurological impairments characterized by his clinical and radiological findings, . . . [Plaintiff] would have been similarly impaired even if his mother's prenatal glucose levels had been lower at an earlier point in her prenatal course." (Doc. No. 69-2, p. 11.)  At Dr. Molofsky's deposition, Plaintiff's counsel asked Dr. Molofsky to explain this statement:

> Q:      Didn't you say in [your expert] report that the maternal
>         hyperglycemia may have influenced [Plaintiff's] current
>         neurological status?

---

[7] At his deposition, Dr. Molofsky similarly opined that Plaintiff's "current neurological status is unrelated to [Ms. Rivera's] sugar levels."  (Deposition of Walter J. Molofsky, M.D. ("Molofsky Dep. Tr.") 84:11-13; 86:12-25.)

A:          I don't think it says that.

Q:          You say "It is further my opinion that while [Plaintiff's] neurological status may have been influenced by his maternal hyperglycemia," I'll get to the rest of the sentence in a minute but when you say "his neurological status may have been influenced by his maternal hyperglycemia," aren't you saying that the maternal hyperglycemia influenced his current neurological status?

MS. HU:     Objection.

A:          No.

Q:          No, you don't mean that?

A:          What I mean is that when his mother's glucose was high he seemed to have an abnormal neurological status reflected in the biophysical profile and as the records indicate when that improved, he clinically improved and then he unfortunately had neurological damage from other issues.

(Molofsky Dep. Tr. 84:15-85:11.)

## III.  _Proceedings Before This Court_

On or about January 15, 2015, Plaintiff commenced this action by filing a Complaint against Defendants United States of America and Urban Health Plans, Inc.[8]  On January 6, 2016, Plaintiff filed an Amended Complaint asserting, _inter alia_, a medical malpractice claim on behalf of the infant Plaintiff due to UHP's negligence in failing to diagnose and treat Ms. Rivera's gestational diabetes.[9]  (Doc. No. 34.)

---

[8] On April 23, 2015, the parties stipulated that Urban Health Plans, Inc. was an improper defendant in this action and that the case caption should be amended to identify United States of America as the sole Defendant.  (Doc. No. 9.)

[9] Plaintiff's Complaint and Amended Complaint also asserted causes of action for lack of informed consent and for Ms. Rivera's derivative claims for the injuries sustained by Plaintiff.  However, at the time the Complaint was filed, Ms. Rivera had not yet exhausted her administrative remedies with respect to the claims she brought in her individual capacity.  Ms. Rivera subsequently commenced two additional actions in the U.S. District Court for the Southern District of New York, Docket Nos. 16-cv-7521 and 16-cv-7523, asserting her individual medical malpractice claims that allegedly arose out of the same locus of operative facts as alleged in this case.  On

On or about October 28, 2016, Plaintiff moved for partial summary judgment.  In support of his motion, Plaintiff submitted a Notice of Motion, a supporting Memorandum of Law (which included a list of 11 supporting exhibits[10]), and a Statement of Uncontested Material Facts pursuant to Rule 56 and Southern District of New York Local Rule 56.1.  (Doc. Nos. 54-55, 59.)  Plaintiff argues that UHP was negligent in failing to diagnose and treat Ms. Rivera's gestational diabetes, and UHP's departure from the reasonable standard of care was the proximate cause of his injuries.

On December 16, 2016, the parties filed a Stipulation of Undisputed Fact, agreeing that: "Defendant departed from accepted standards of medical practice during the course of its provision of prenatal care to Michelle Rivera."  (Doc. No. 70.)

On December 16, 2016, Defendant opposed Plaintiff's motion, filing the following documents:  Defendant's Response to Plaintiff's Local 56.1 Statement of Facts; Memorandum of Law; the Declaration of Jessica Hu, Esq. and supporting exhibits; the Phelan Declaration and supporting exhibits; and the Molofsky Declaration and supporting exhibits.  Defendant argues

---

December 16, 2016, the parties stipulated to consolidate the three related actions and to dismiss the individual claims of Ms. Rivera from the caption of this case.  (Doc. No. 71.)  The Court so-ordered this stipulation.  (*Id.*)

[10] Plaintiff's counsel indicated in a letter that he mailed hard copies of the exhibits listed in his memorandum of law to the Court, but that he did not electronically file the exhibits due to their voluminous nature.  (Doc. No. 53.)  In addition to the 11 exhibits purportedly annexed to Plaintiff's moving brief, Plaintiff's counsel subsequently filed 14 additional exhibits at the Court's request.  (Doc. No. 78.)  However, neither set of exhibits were submitted via an attorney affidavit or declaration, as is required under this Court's Rules.  *See* S.D.N.Y. Local Rule 7.1(a)(3) (all motions shall include "[s]upporting affidavits and exhibits thereto containing any factual information and portions of the necessary for the decision of the motion").  "There is no provision for filing freestanding exhibits unmoored to an affidavit or declaration made on personal knowledge."  *Spears v. City of N.Y.*, No. 10-cv-3461, 2012 WL 4793541, at *1, n.2 (E.D.N.Y. Oct. 9, 2012) (citing Fed. R. Civ. P. 56(c)(4)).  However, since Defendant did not object to Plaintiff's exhibits and did not challenge the authenticity of the exhibits, this Court will consider Plaintiff's exhibits to the extent relevant.  *See id.*

that Plaintiff's motion should be denied because there is a dispute of material fact as to

causation, as evidenced by the competing expert opinions.

Plaintiff subsequently filed a reply memorandum of law in further support of his motion

for partial summary judgment, as well as a Response to Defendant's Statement of Additional

Material Facts.  (Doc. Nos. 72-73.)  In his reply brief, Plaintiff contends that the Phelan

Declaration and Molofsky Declaration should be disregarded on the grounds that they

contradict prior sworn testimony of Dr. Phelan and Dr. Molofsky, respectively.  Plaintiff further

argues that even if all facts are construed in Defendant's favor, he is still entitled to summary

judgment because UHP's negligence triggered the stream of events that ultimately produced

Plaintiff's injuries.

Plaintiff's counsel also filed a request for oral argument on the motion, which the Court

granted.  The Court heard oral arguments on January 12, 2017.  (Doc. No. 76.)

**DISCUSSION**

I.      ***Legal Standard Governing Motions For Summary Judgment Under Rule 56***

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

10

In determining whether a genuine issue of material fact exists, the court is required to resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *Id.* at 255.  However, the opposing party "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations and citations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  In sum, if the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is warranted. *Matsushita*, 475 U.S. at 587 (citation omitted).

## II.    ***Defendant's Expert Declarations***

Plaintiff argues in his reply brief that the Court should disregard the Phelan and Molofsky Declarations on that the grounds that they contradict each expert's prior sworn testimony.  Plaintiff is correct that that a non-movant cannot create a genuine issue of fact to defeat summary judgment simply by contradicting his own prior sworn statements. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999).  However, "a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony . . . especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The Court addresses Plaintiff's challenges to each expert in turn.

A.      _Dr. Phelan_

Plaintiff argues that Paragraph 17 of the Phelan Declaration—which asserts that

Plaintiff's condition "most likely resulted from a hypoxic event that commenced no earlier than

3:32 a.m. on February 14, 2014, and . . . not the earlier maternal hyperglycemia that Ms. Rivera

experienced" (Phelan Decl. ¶ 17)—conflicts with Dr. Phelan's prior deposition testimony.

According to Plaintiff, the "implication" of Paragraph 17 of the Phelan Declaration is that "'only'

a hypoxic event most likely caused [Plaintiff's] condition" (Doc. No. 72, ¶ 7), whereas Dr. Phelan

testified at his deposition that multiple factors contributed to Plaintiff's injury.  Specifically, Dr.

Phelan testified:

| | |
|---|---|
| Q: | Dr. Phelan, did we agree that there can be several different causes of injury to a person or to a fetus during pregnancy? |
| MS. HU: | Note my objection. |
| A: | Well, I'm not sure I fully understand.  If you go back and look at my report, I've enumerated multiple factors that were -- could be responsible for this child's neurological impairment, and I say that it . . . occurred at or around the time of his birth or contributed to his premature and/or dystrophic features.  So, we have multiple factors coming in: intrapartum, pre-existing by virtue of having multiple dysmorphic features, as well as by being born too soon. |

(Deposition of Jeffrey P. Phelan ("Phelan Dep. Tr.") 143:21-144:17.)

This Court disagrees with Plaintiff that Paragraph 17 of the Phelan Declaration is

inconsistent with his prior sworn testimony.  Plaintiff's argument rests on an "implication" that

is simply not supported by the plain language of the Phelan Declaration.  Specifically, the Phelan

Declaration does not state that the intrapartum hypoxic event was the _sole_ cause of Plaintiff's

impairments; rather, it says that the hypoxic event "most likely" caused his injuries.  In arguing

that a contradiction exists, Plaintiff is conflating two different questions—what factors could

12

have caused Plaintiff's injuries, and which of the factors identified by Dr. Phelan most likely

caused the injuries.  Plaintiff's counsel does not identify any prior sworn statement where Dr.

Phelan opined as to which potential contributing factor was most likely to have brought about

Plaintiff's impairments.  Therefore, Paragraph 17 of the Phelan Declaration does not contradict

his prior testimony and should be considered in connection with this motion.

      B.    *Dr. Molofsky*

Plaintiff also argues that Paragraph 6 of the Molofsky Declaration, which opines that

Plaintiff's "current neurological status is unrelated to his mother's sugar levels" (Molofsky Decl.

¶ 6), contradicts Dr. Molofsky's expert report and deposition testimony.  According to Plaintiff,

Dr. Molofsky testified and stated in his expert report that Plaintiff's neurological status "may

have been influenced by his maternal hyperglycemia."  (Doc. 72, ¶ 9.)  Turning first to the

alleged contradiction between the Molofsky Declaration and the deposition testimony, Plaintiff

does not cite to any portion of Dr. Molofsky's deposition transcript where the allegedly

contradictory testimony is proffered.[11]  This Court also did not find any such conflicting

testimony in its thorough review of the transcript from Dr. Molofsky's deposition that was

provided to the Court.  On the contrary, the transcript reveals that Dr. Molofsky repeatedly

testified that Plaintiff's "current neurological status is unrelated to [Ms. Rivera's] sugar levels."

(Molofsky Dep. Tr. 84:11-13; 86:12-25.)  This testimony is entirely consist with the opinion set

forth in Paragraph 6 of the Molofsky Declaration.

---

[11] During oral argument, Plaintiff indicated that he would identify citations to the allegedly contradictory portions of Dr. Molofsky's deposition testimony, but this information was never provided to the Court.

With respect to the purported contradictions between the Molofsky Declaration and his expert report, the Court first notes that Dr. Molofsky's expert report is merely a signed letter, not a prior sworn statement.  Plaintiff did not dispute this fact at oral argument.  In any event, the Court disagrees that Dr. Molofsky's expert report directly contradicts the statements in his Declaration.  In Dr. Molofsky's expert report, he vaguely asserts that Plaintiff's "neurological status may have been influenced by his maternal hyperglycemia."  (Doc. No. 69-2, p. 11.) However, when questioned about this statement at his deposition, Dr. Molofsky clarified that the statement referred to Plaintiff's prenatal neurological status, not his *current* neurological status.  Specifically, Dr. Molofsky testified that he intended for his report to explain that Plaintiff had an abnormal neurological profile at the time when Ms. Rivera's glucose levels were abnormally high (as evidenced by his low BPP scores), but that Plaintiff's neurological profile clinically improved prior to his birth (as evidenced by his rising BPP scores) until Plaintiff suffered injuries for reasons unrelated to Ms. Rivera's glucose levels.  (*See* Molofsky Dep. Tr. 84:15-85:11.)  When Dr. Molofsky's vague statement in his expert report is considered in light of his explanatory testimony, the Court does not find that the report contradicts the Molofsky Declaration.   Accordingly, there is no basis to strike or otherwise disregard the Molofsky Declaration.

### III.   *G.C.W.'s Negligence Claim*

Plaintiff alleges a medical malpractice claim against Defendant under the FTCA.[12]

"Under the FTCA, the liability of the United States for the negligent acts of its agents is

governed by the law of the state in which the alleged negligence occurred." *Ford v. United*

*States of Am.*, No. 98-cv-6702 (THK), 2000 WL 1745044, at *4 (S.D.N.Y. Nov. 27, 2000) (citing 28

U.S.C. § 1346(b)(1)).  In this case, the alleged negligence occurred at UHP, which is located in

the Bronx.  Thus, New York law applies to Plaintiff's claim.  *See id.*

To prevail on a medical malpractice claim under New York law, a plaintiff must prove:

"(1) that the defendant breached the standard of care in the locality where the treatment

occurred, and (2) that the breach was a proximate cause of the plaintiff's injuries." *Id.* at *4.

Although Plaintiff addressed both of these elements in his moving brief, the parties

subsequently stipulated that "Defendant departed from accepted standards of medical practice

during the course of its provision of prenatal care to Michelle Rivera."  (Doc. No. 70.)  Thus, the

only remaining issue is whether there is any dispute of material fact that Defendant's

negligence was the proximate, or legal, cause of Plaintiff's injuries.

In assessing whether Plaintiff has established causation as a matter of law, the Court

must determine whether any trier of fact could conclude that Defendant's negligence was not

---

[12] The FTCA confers exclusive jurisdiction on the district court for actions for money damages against the United States for:

> money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"a substantial cause of the events which produced the injury." *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016) (quoting *Derdiarian v. Felix Constr. Corp.*, 51 N.Y.2d 308, 315 (1980)); *see also Bonsignore v. City of N.Y.*, 683 F.2d 635, 637 (2d Cir. 1982) (proximate causation limits a defendant's liability to "those foreseeable consequences that the defendant's negligence was a substantial factor in producing").

"When a question of proximate cause involves an intervening act, 'liability turns on whether the intervening act is a *normal or foreseeable consequence* of the situation created by the defendant's negligence.'" *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (quoting *Mazella*, 27 N.Y.3d at 706) (emphasis in original).  Thus, where "the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed." *Derdiarian*, 51 N.Y.2d at 315.  The causal nexus may terminate, however, if the intervening act was "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct." *Id.*  For example, courts have recognized that "where an [injury] is one which might naturally occur from causes other than a defendant's negligence, the inference of his negligence is not fair and reasonable." *Mortensen v. Mem'l Hosp.*, 105 A.D.2d 151, 158 (1st Dep't 1984) (citations omitted).  Stated in other words, "proximate cause will be found lacking where the original negligent act merely furnished the occasion for—but did not cause—an unrelated act to cause injuries not ordinarily anticipated."[13] *Hain*, 28 N.Y.3d at 530 (internal quotations omitted).

---

[13] But, "[t]he mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because there may be more than one proximate cause of an injury." *Mazella*, 27 N.Y.3d at 706 (internal quotations and citation omitted).

Although there are instances where proximate cause can be established as a matter of law, it is generally viewed as an issue of fact because questions of foreseeability and what constitutes extraordinary circumstances may give rise to varying inferences.[14] *Derdiarian*, 51 N.Y.2d at 315; *see also, e.g., Bacon v. United States,* 104 F. App'x 208, 209 (2d Cir. 2004) ("[t]ypically, a jury decides . . . issues of causation").  If the proof is ambivalent as to the issue of whether the plaintiff would have suffered the same outcome regardless of the malpractice, then a "pure factual issue is raised" that can "only be resolved by a jury determination of whether the malpractice proximately deprived the [injured party] of [a] substantial possibility" of a better outcome.  *Mortensen*, 105 A.D.2d at 157.

Plaintiff argues that this case is one of the rare instances where causation can be established as a matter of law.  Plaintiff asserts that summary judgment is warranted because: (1) Ms. Rivera's hyperglycemia directly caused cell death in Plaintiff's brain, as evidenced by the lack of fetal movement that prompted Ms. Rivera to go to Montefiore; (2) the injury Plaintiff sustained from Ms. Rivera's hyperglycemia exacerbated the effects of any subsequent acute injury; or, at the very least, (3) UHP's negligence triggered the stream of events that ultimately caused Plaintiff's injuries and it was reasonably foreseeable that such injuries would occur. Plaintiff relies on the testimony of its expert, Dr. Yohay, in support of these arguments.

---

[14] A variety of factors can influence the fact-sensitive proximate cause determination, including "the foreseeability of the event resulting in injury; the passage of time between the originally negligent act and the intervening act; the spatial gap, if any, between the original act and the intervening act; whether the original act of negligence was a completed occurrence or was ongoing at the time of the intervening act; whether and, if so, what other forces combined to bring about the harm; as well as public policy considerations regarding the scope of liability."  *Hain*, 28 N.Y.3d at 530 (citations omitted).

In contrast, Defendant's experts, Dr. Phelan and Dr. Molofsky, contend that Plaintiff's injuries were most likely caused by an independent, intervening event unrelated to Ms. Rivera's earlier hyperglycemia.  In Defendant's view, Plaintiff had fully recovered from the effects of Ms. Rivera's earlier hyperglycemia while at Montefiore because he recorded a BPP score of 8/8 and, thus, was a neurologically normal and healthy fetus as of early morning on February 13, 2014.

Under New York law, summary judgment is inappropriate in circumstances where, like here, there are conflicting expert opinions.  *See e.g.*, *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (collecting cases); *Richardson v. City of N.Y.*, 15-cv-543 (LAK) (AJP), 2015 WL 7752143, at *14, n.19 (S.D.N.Y. Nov. 18, 2015).  In particular, Plaintiff's first two theories of causation require a finding that Plaintiff's brain was already injured at the time he recorded the 8/8 BPP score, a fact that Defendant's experts vehemently contest.  There also is a factual dispute over whether the effects of Ms. Rivera's hyperglycemia had ended at the time Plaintiff's BPP score was 8/8—as Defendant says it had—or whether the effects were still ongoing—as Plaintiff contends.  *See Hain*, 28 N.Y.3d at 530 (one of the "fact-specific determination[s]" relevant to the proximate cause determination is "whether the original act of negligence was a completed occurrence or was ongoing at the time of the intervening act").  It is not the function of the court to resolve these competing positions at the summary judgment stage.  *Id.* (question of fact on the issue of proximate cause is presented where defendant's negligence left plaintiff in a position susceptible to further harm).

Plaintiff also contends that he is entitled to summary judgment because it is undisputed that Ms. Rivera's hyperglycemia caused her to go into premature labor, and that Plaintiff's prematurity was a substantial factor in his injuries.  Although Defendant's expert, Dr. Phelan,

agrees that Plaintiff's prematurity was a contributing factor to his injuries, Dr. Phelan disputes

that Ms. Rivera's hyperglycemia caused Plaintiff's premature birth.  When asked if Plaintiff

would have been born prematurely if Ms. Rivera had not been admitted to the hospital for

hyperglycemia, Dr. Phelan testified that "[Ms. Rivera] was treated, the child went back to

normal and became normal.  So, what happened subsequently is independent of any events

that preceded it, because the child went back to normal."  (Phelan Dep. Tr. 144:18-145:8.)  In

other words, Defendant denies that Ms. Rivera's hyperglycemia contributed to, or led to,

Plaintiff's premature birth because, in Defendant's view, Plaintiff was a neurologically normal

fetus on February 13, 2014 and then an independent hypoxic event occurred between 3:32

a.m. and 4:12 a.m. on February 14, 2014.  (Phelan Decl. ¶ 12.)  Defendant's assertion that an

independent intervening event, and not Ms. Rivera's earlier hyperglycemia, caused Plaintiff's

prematurity is a dispute of fact that precludes summary judgment.

Plaintiff contends that even if an independent intervening hypoxic event was the actual

cause of his injuries, the case law still supports a finding of proximate cause under the

circumstances of this case because it was foreseeable that UHP's negligence could lead to

injury.  The Court disagrees with Plaintiff's interpretation of the applicable case law as imposing

liability when there is an independent intervening event that causes the ultimate injury.  The

New York Court of Appeals has repeatedly articulated that an independent intervening act can

be sufficient to sever the causal connection.  *See, e.g., Derdiarian*, 51 N.Y.2d at 315 (causal

nexus may be severed where the intervening act is "independent of . . . the defendant's

conduct").  For example, in *Hain,* a case that Plaintiff repeatedly referenced during oral

argument, the New York Court of Appeals surveyed the limitations of the proximate cause

doctrine and explained that the chain of causation may be severed in situations where the plaintiff has recovered from the defendant's negligence and then a second harmful incident independently occurs.  28 N.Y.3d at 529-32, 534 (holding that a factual dispute over proximate cause precluded summary judgment).  This scenario is precisely what Defendant argues occurred in this case.  Thus, under the standard articulated in *Hain*, the question of whether "due to [] defendant's negligence, the plaintiff is left in a position susceptible to further harm" must be left for the fact finder and cannot be resolved by the Court at the summary judgment stage.  *Id.* at 532.

Similarly, Plaintiff's reliance upon *Grant v. Westinghouse Electric Corp.*, 877 F. Supp. 806 (E.D.N.Y. 1995) for the proposition that proximate cause is established as a matter of law any time the injury "naturally flows" from the original negligent act is misplaced.  In *Grant*, the plaintiff was injured when he sought to repair a malfunctioning electrical switchboard manufactured by defendant.  *Id.* at 808.  Following a jury verdict that*, inter alia*, defendant was negligent for failing to provide warnings about defects in its product but that plaintiff had negligently carried out his repairs, the defendant moved for judgment as a matter of law on the grounds that the plaintiff's own negligence was an intervening act that severed the causal connection between defendant's negligence and plaintiff's injuries.  *Id.* at 808, 815-16.  The court denied defendant's motion and held that the jury could legitimately conclude that plaintiff's negligent repair efforts were "triggered by and flowed from" defendant's negligence given the evidence in the case.  *Id.* at 819-20.  The court's rejection of the defendant's argument that proximate cause was lacking under the facts of *Grant* does not mean, however, that proximate cause is *per se* established every time the plaintiff's injury "flows" in some

manner from the original negligent act, as Plaintiff suggests.  Indeed, *Grant* recognizes that

causation is a fact issue for the jury or factfinder to resolve.  *Id.* at 820 ("[s]uch causal issues

typically present questions of fact, as is the case here").   Furthermore, the *Hain* case—decided

after *Grant*—makes it clear that the doctrine of proximate cause is subject to limitations,

including where the original act of negligence is completed, as Defendant argues occurred here.

*Hain*, 28 N.Y.3d at 530-32 (an intervening act may break the causal nexus, even if the risk

created and the actual harm are similar, where "defendant's acts of negligence had ceased, and

merely fortuitously placed the plaintiff in a location or position in which a secondary and

separate instance of negligence acted independently upon the plaintiff to produce harm").[15]

For all of the reasons set forth above, there is a genuine dispute of material fact

regarding whether UHP's negligence was the proximate cause of Plaintiff's injuries.

### CONCLUSION

For the foregoing reasons, this Court **DENIES** Plaintiffs' Motion for Partial Summary

Judgment.

**SO ORDERED.**

Date:   March 8, 2017
        New York, New York

_Katharine H. Parker_

KATHARINE H. PARKER
United States Magistrate Judge

---

[15] The Court further notes that other cases cited in Plaintiff's briefs are factually distinguishable because they do not involve medical malpractice negligence claims and many are in different procedural postures than this case.  It also cannot be overlooked Plaintiff's cited cases uniformly acknowledge that proximate cause is a fact-sensitive inquiry.